* * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rowell and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission AFFIRMS with modifications the Opinion and Award of Deputy Commissioner Rowell.
 * * * * *Page 2 
The Full Commission finds as fact and concludes as a matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner and following the hearing as:
 STIPULATIONS
1. All parties are properly before the Commission and the Commission has jurisdiction of the parties and the subject matter.
2. Plaintiff is Joseph Frederici.
3. Defendant-employer is Skanska USA Building, Inc.
4. The carrier on the risk at the time of the alleged injuries was St. Paul Fire Marine.
5. Defendant-employer regularly employs three or more employees and is bound by the North Carolina Workers' Compensation Act. An employer-employee relationship existed between Defendant-employer and Plaintiff on December 2, 2003, the date of injury.
6. Plaintiff's wages were sufficient to exceed the maximum disability compensation rate of $674.00 for the year 2003.
7. Plaintiff sustained an injury by accident arising out of and in the course of his employment on December 2, 2003.
8. Plaintiff's neck and back injuries have been accepted by defendants as causally related to the motor-vehicle accident on December 2, 2003.
9. The issues to be determined are as follows:
 a. Whether Plaintiff's knee and leg problems are causally related to his compensable claim; and, *Page 3 
 b. Whether Plaintiff is entitled to temporary total disability payments from June 4, 2004, and continuing.
 * * * * EVIDENCE
1. The parties stipulated into evidence the following exhibits:
 a. Stipulated Exhibit #1 — Pre-Trial Agreement
 b. Stipulated Exhibit #2 — Medical records, Industrial Commission forms, and various documentation
2. The following individuals testified at the hearing before the Deputy Commissioner:
 a. Joseph Frederici
 b. Benjamin E. Dunn
3. The following depositions were received into evidence following the hearing before the Deputy Commissioner:
 a. Douglas McKee, M.D.
 b. Phillip Clifford, M.D.
 * * * *
Based upon all the competent evidence of record and the reasonable inferences arising therefrom, the Full Commission enters the following:
 FINDINGS OF FACT
1. As of the date of the hearing before the Deputy Commissioner, Plaintiff was 48 years old, had been married for 26 years, and had four children. Originally from Illinois, he graduated from high school in Chicago. He has worked in the construction business nearly all *Page 4 
his life. He started out as a carpenter and worked his way up into a management position with various construction companies.
2. Plaintiff began working for Defendant-employer in approximately July 1997 as a superintendent. Most of the projects he oversaw were over $5 million in value. Throughout his employment with Defendant-employer, Plaintiff received salary increases. At the time of the injury by accident described herein, Plaintiff's weekly wage was approximately $1,425.00.
3. Prior to this claim, Plaintiff had experienced neck and left knee problems. He had treated at Duke for his left knee in 1999. He returned to Duke in April 2001 for his left knee problems and underwent physical therapy. He had also treated with Preferred Chiropractic in April 2001 for his neck. There is no medical evidence, however, that he treated with any doctor in the time period between July 20, 2001, and the date of the accident for either of these conditions. In fact, the three notes from Plaintiff's family doctor, Dr. Douglas McKee, in the year prior to the accident make no mention of either left knee or neck complaints.
4. On December 2, 2003, Plaintiff left the Defendant-employer's office on his way to their construction yard to pick up some rebar. While he was stopped for traffic on Glenwood Avenue, a car rear-ended his truck and pushed him into a car in front of him. The car of the person who rear-ended him was all the way underneath Plaintiff's truck and had to be pulled apart. Plaintiff could not say if his knee hit the dashboard, but he does remember being bounced around because of the collision. At the scene, he felt pain in his upper back and lower back. He declined to be transported by ambulance.
5. Plaintiff called Ben Dunn, the local safety director with Defendant-employer, and informed him of the accident. Mr. Dunn told him that he should file any medical bills with his health insurance. Plaintiff was discouraged from filing a workers' compensation claim because *Page 5 
he feared he would be terminated, as he believed others had been. Furthermore, even though one of Mr. Dunn's primary duties is workers' compensation, he claims that it is optional to file a report of a job accident.
6. Plaintiff initially went home, but later went to the emergency room at Rex Hospital. He reported to the emergency room doctor that he was experiencing numbness and tingling. X-rays of the cervical spine and thoracic spine showed mild degenerative joint disease. The emergency room doctor diagnosed acute cervical strain and thoracic contusion. The doctor also prescribed Vicodin and recommended that Plaintiff see his family doctor if his symptoms persisted. Plaintiff testified at the hearing before the Deputy Commissioner that he made mention of his left knee complaint near the end of his visit with the emergency room doctor. There is no mention of left knee complaints in the medical records for this visit. However, according to Dr. Clifford, who eventually treated Plaintiff for his left knee problems, the kind of knee injury Plaintiff sustained would have produced occult instability, which would have been comparatively tolerable for the patient and led him to not report it, especially if he was distracted by cervical spine injuries.
7. Following his release from the hospital, Plaintiff went home for the rest of the day, and returned to work the next day.
8. Two to three days after the accident, Plaintiff told Mr. Dunn that he was experiencing left knee problems from the accident.
9. Six days after the accident, on December 8, 2003, Plaintiff saw Dr. Steven M. Rosoff of Glenwood Chiropractic. Plaintiff reported that he was experiencing pain in his neck, low back, shoulder, and knee. Plaintiff indicated to Dr. Rosoff that his mobility was worsening due to the low back and knee pain, and that it was interfering with his work activities. Dr. *Page 6 
Rosoff examined Plaintiff and diagnosed him with hyperextension/hyperflexion strains/sprains to the lumbar, thoracic, and cervical spine. Plaintiff began a treatment program consisting of manipulations, myofascial releases, and massage therapy. Throughout his treatment of Plaintiff, Dr. Rosoff noted Plaintiff's knee complaints. Dr. Rosoff treated Plaintiff until September 15, 2004. At discharge, Dr. Rosoff stated that Plaintiff had failed to reach complete restoration of his spinal injuries. He also opined that his findings were consistent with the history of the injury as described by the Plaintiff.
10. A month after the accident, on January 2, 2004, Plaintiff presented to Dr. McKee, his family doctor, at Triangle Family Practice. Plaintiff told Dr. McKee that he was having trouble with his left knee, neck, mid-back, and lower back. He also told Dr. McKee that he had experienced knee problems in the past. Dr. McKee's examination of Plaintiff revealed back spasms and knee pain. Dr. McKee diagnosed neck, back, and knee strain, and recommended MRI's of Plaintiff's back, neck, and knee, medication, and continued chiropractic care. Dr. McKee stated in his deposition that he would expect someone with these kinds of complaints to have difficulty doing normal activities of daily living. Dr. McKee further stated that Plaintiff's injuries were a big source of frustration for Plaintiff because he wanted to do his job and did not want to be taken out of work.
11. The MRI of Plaintiff's left knee revealed a partial tear of the posterior cruciate ligament at its insertion in the femur, as well as extensive chondromalacia, joint spacing narrowing, and adjacent bone edema in the medial femoral tibial compartment associated with a comminuted tear of the medial meniscus. Dr. McKee testified as to the significance of these findings, in that they correlated with the pain Plaintiff described experiencing and that they are usually secondary to some type of trauma. *Page 7 
12. Plaintiff followed up with Dr. Laurence Higgins at the Orthopaedic Clinic at Duke University Medical Center on January 21, 2004. Plaintiff told Dr. Higgins that, over the previous month, his left knee had been swollen and stiff and that it was affecting his work. Dr. Higgins noted moderate medial aspect joint line tenderness, and indicated that the left knee pain most likely represented a contusion, as there was evidence of bony edema consistent with bone contusion on the MRI. Dr. Higgins recommended conservative treatment including rest, ice, anti-inflammatories, and a medial unloader brace.
13. On his return visit to Duke on February 25, 2004, Plaintiff saw Dr. Mark E. Easley. Plaintiff told Dr. Easley of his prior history of knee problems, and that his knee was bothering him consistently and was worse with activity. Dr. Easley noted mild crepitance with range of motion testing, and diagnosed Plaintiff with post-traumatic arthritis of the knee. Dr. Easley gave Plaintiff some information about knee replacement, and suggested that plaintiff undergo steroid or Synovisc injections and continue to use the unloader brace.
14. Plaintiff returned to Dr. McKee on March 5, 2004. Plaintiff indicated that his knee was causing difficulty with walking and that the pain was made worse with activities, particularly with stair climbing. Plaintiff also reported that he was having difficulties doing his job duties. Dr. McKee noted in his records Plaintiff's prior history of knee problems. Plaintiff informed Dr. McKee that he was worried about the suggestion of a knee replacement because he feared his knee replacement would give out sooner than ten years because of the heavy work he performed. According to Dr. McKee, Plaintiff was also concerned because he could not do his job the way he wanted to because of the pain. On exam, Dr. McKee noted some medial joint pain as well as anterior and posterior joint line pain. Dr. McKee recommended that Plaintiff return to an orthopedist, and assisted Plaintiff in setting that up. Though he did not provide work *Page 8 
restrictions to Plaintiff at the March 2004 appointment, Dr. McKee stated that he would have provided light duty restrictions such as no walking up and down stairs and sedentary work.
15. At his deposition, Dr. McKee testified that, more likely than not, the auto accident of December 2, 2003, aggravated and made worse Plaintiff's pre-existing left knee problems. By agreement of the parties, Dr. McKee has been deemed an expert in family medicine.
16. Plaintiff went to see Dr. David Dellaero of Triangle Orthopaedics on March 12, 2004. Plaintiff told Dr. Dellaero of his prior history of knee problems, and that he might have hit his knee on the dashboard in the December 2003 auto accident. Plaintiff reported that his knee was worsening and that it affected his ability to work. On exam, Dr. Dellaero noted that Plaintiff's gait was mildly antalgic on the left and that there was mild effusion, crepitation in the medial compartment, and tenderness at the medial patellofemoral joint. Dr. Dellaero also found patellofemoral crepitation throughout the range of motion, and noted mild atrophy in the left leg compared to the right. Dr. Dellaero reviewed the MRI of Plaintiff's left knee and noted some tearing of the medial meniscus and some increased signal at the posterior cruciate femoral attachment consistent with partial tear. Dr. Dellaero diagnosed Plaintiff with left knee post-traumatic arthritis, primarily effecting the medial compartment with some medial meniscus tearing with reports of progressively worsening pain and function since injury on December 2, 2003. Dr. Dellaero explained that he did not believe that arthroscopy would help much, but that reconstructive options might be of benefit. He recommended that Plaintiff see Dr. Philip Clifford, who also practiced in his office, for further discussion of this.
17. Plaintiff met with Dr. Clifford on March 26, 2004. Dr. Clifford indicated that he had reviewed the extensive notes made by Dr. Dellaero and that Plaintiff was there to review appropriate medical care for his condition. Plaintiff's complaints and symptoms were the same. *Page 9 
Dr. Clifford noted on exam that there was some trace effusion about the left knee, and found some definite medial and lateral tenderness. Dr. Clifford also found some significant parapatellar symptoms with pain with compression and pain with apprehension and mobilization of the patella. Dr. Clifford's impression was that, clinically, it appeared as though there were significant parapatellar symptoms concerning the progressive osteoarthritis or residual discomfort following Plaintiff's accident. Dr. Clifford recommended an injection, which was performed, and observation. According to Dr. Clifford, Plaintiff was concerned about losing his job and did not want work restrictions imposed because he had always worked in his life and never wanted to be a "guy who went out of work."
18. On April 14, 2004, Plaintiff returned to Dr. Clifford and reported that the injection had greatly improved his symptoms. Despite this, Plaintiff reported that he was losing balance at work and stated that management was not supporting him in that he was told he was not working hard enough. It was painful for Plaintiff to walk long distances, up and down stairs, and on uneven surfaces. Dr. Clifford noted crepitus with range of motion with Plaintiff's left knee, and recommended treatment with work modification, time, and observation. After discussion of his treatment options, Plaintiff elected to treat the problem with time and observation. According to Dr. Clifford, Plaintiff likely had pre-existing osteoarthritis which had been exacerbated, and might require total knee replacement and eventual revision surgery based on his young age.
19. Plaintiff returned to Dr. Clifford on April 23, 2004. Plaintiff stated that his symptoms were improving but that he was not yet back to his baseline. On exam, Dr. Clifford noted positive varus deformity on the left knee as well as crepitus, and recommended surgery, work modification, time, and observation. Dr. Clifford testified that the work modifications would have been the ones he eventually gave Plaintiff on July 14, 2004, but that Plaintiff never *Page 10 
wanted to back off from working. Of the three surgical options presented, Plaintiff indicated he would have arthroscopic debridement if he chose to have surgery, because he wanted to avoid a total or partial knee replacement. Plaintiff told Dr. Clifford that he would call him when he made his final decision to have surgery.
20. During the spring and early summer of 2004, Plaintiff made inquiries about short-term disability through Defendant-employer's human resources department, because Plaintiff wanted to receive disability pay if he should have the surgery. During the same time period, Plaintiff had his annual review, and one of the things he was marked down for was not showing interest in his job. Plaintiff was coming under increasing criticism because he had to come in late or leave early for doctor's appointments.
21. On June 4, 2004, Plaintiff was terminated by Defendant-employer. Mr. Dunn testified before the Deputy Commissioner that Plaintiff was let go because of company-wide restructuring. Plaintiff testified that, though he was aware of this restructuring, he believed he was terminated because of his on the job accident. There is no evidence in the record that the termination was "for cause." After his termination, Plaintiff was told that he could no longer pursue a short-term disability claim. Plaintiff filed a Form 18 on June 9, 2004. Defendant filed a Form 19 on the same day.
22. The Full Commission finds that, at the time of his firing, Plaintiff was under work restrictions that included no lifting over 75 pounds, no repetitive lifting over 50 pounds, no bending or squatting, and no excessive walking or climbing. Though these work restrictions were first specified in detail by Dr. Clifford on July 14, 2004, Dr. Clifford had made notes about job modifications in his medical records in the visits prior to Plaintiff's termination, and Dr. Clifford testified that these restrictions were de facto in place prior to the termination. Dr. *Page 11 
Clifford further testified that he had discussed work restrictions with Plaintiff since their first visit. Although Dr. Clifford had talked with Plaintiff about the possibility of trying work restrictions, Plaintiff seemed very reluctant and concerned that he might lose his job. According to Dr. Clifford, the July 14, 2004, restrictions were the same restrictions he had recommended for Plaintiff on his April 23, 2004, treatment plan, and the same restrictions he would have given Plaintiff way back when he first saw him on March 26, 2004, if Plaintiff had been willing to take them. Regardless of whether Mr. Dunn knew of these restrictions, which he most likely did since he was aware of Plaintiff's efforts to apply for short term disability, Plaintiff was under the restrictions on the date of his termination.
23. On June 15, 2004, Plaintiff presented to Dr. Peter R. Bronec at Regional Neurosurgery for continued neck pain. At that time, he was still treating with Dr. Rosoff, the chiropractor. Plaintiff stated that he was experiencing pain radiating down his arms as well as constant numbness and tingling. Dr. Bronec diagnosed bilateral C5 and C6 radiculopathies secondary to C4-5 and C5-6 cervical stenosis with moderate cord compression as well as low back pain and lateral leg paresthesias secondary to minimal degenerative disc disease. Dr. Bronec stated that these conditions had been aggravated by Plaintiff's auto accident on December 2, 2003, and recommended anterior cervical disc fusion at C4-5 and C5-6. Plaintiff sought out a second opinion about the need for this surgery with Dr. Michael J. Alexander of Duke on July 14, 2004. Dr. Alexander was in general agreement with Dr. Bronec. Pursuant to the stipulations in this case, Defendants have agreed that this part of Plaintiff's claim is compensable.
24. Between the date of his injury by accident on December 2, 2003, and his termination by Defendant-employer on June 4, 2004, Plaintiff had worked on a project for *Page 12 
Defendant-employer building two additions to St. Andrews Catholic Church. By June 4, 2004, the project was substantially complete, with only a few punch list items remaining and some code issues that were preventing St. Andrews from securing a Certificate of Occupancy from the city. Following his termination by Defendant-employer, St. Andrews hired Plaintiff directly to do the code updating and address a rainwater drainage problem. Plaintiff and his son, who had just graduated from high school, completed the work in a couple of months, with Plaintiff's son doing most of the physical work required, including digging, lifting, and running for this and that. Plaintiff estimated that Plaintiff and his son had billed St. Andrews $21,000.00 for the materials and labor, of which Plaintiff netted roughly $4,000.00. Following the completion of the code updating project for St. Andrews, the only work Plaintiff was able to find was a day and a half worth of industrial maintenance work in December 2004 for a general contractor Plaintiff had worked with once while working for Defendant-employer. Plaintiff estimated that he netted four or five hundred dollars for the industrial maintenance work.
25. Unable to find work following the code updating project for St. Andrews, Plaintiff went on unemployment and received $370.00 a week for 26 weeks. During this period of time and up until he was deemed disabled under Social Security in February 2005, Plaintiff consistently looked for work week after week. Plaintiff contacted a minimum of three employers a week. Plaintiff contacted industry headhunters to inquire about job leads, and contacted people he knew in the industry, but all to no avail. One person Plaintiff contacted, Mr. Guliana, tried to get him a job but could not place him because of Plaintiff's work restrictions. The companies Plaintiff contacted included D.H. Griffin, Evergreen, Sanderson, Wardson, R.P. Construction, Crowder Construction, and Boch Construction. Plaintiff was never able to find employment. *Page 13 
26. The Full Commission finds that Plaintiff received a total of $9,620.00 in unemployment compensation. The Full Commission further finds that, following his June 4, 2004, termination by Defendant-employer, Plaintiff earned $4,000.00 over an approximately eight-week period and an additional $500.00 during a subsequent week, for a total of nine weeks of wages at $500.00 per week.
27. Plaintiff returned to Dr. Clifford on September 7, 2004, with worsening symptoms of left knee pain. Dr. Clifford's exam revealed positive valgus deformity with the left knee, positive crepitus, moderate tenderness and mild swelling along the left medial and lateral joint lines. Dr Clifford's recommendations continued to be surgery, medication, time, and observation, and Plaintiff's work restrictions did not change.
28. On January 24, 2005, Plaintiff saw Dr. Clifford because of his need for another knee injection. Plaintiff indicated that he was still contemplating surgery. Dr. Clifford performed the injection.
29. In February 2005, Plaintiff was diagnosed with ampullary carcinoma with suspected invasion of his pancreas. He immediately began treatment, which consisted of chemotherapy, radiation, and eventually surgery. Plaintiff also experienced a massive heart attack during this period. Plaintiff became eligible and received Social Security Disability beginning in February 2005, and is scheduled to receive $1900 a month in SSD payments. Plaintiff's course of treatment put his need for neck and knee surgery on hold indefinitely. Plaintiff's cancer treatment made him extremely tired and sick and thus made it impossible for him to pursue his job search.
30. On October 27, 2005, Plaintiff went back to Dr. Clifford's office for an appointment. Plaintiff had done surprising well with his cancer treatment. However, his left *Page 14 
knee pain had worsened, and it was making it very difficult for him to exercise and walk. On exam, Dr. Clifford noted femoral crepitance, effusion, and diffuse tenderness. New X-rays demonstrated end stage bone on bone medial compartment narrowing, grade 4, with grade 3-4 changes laterally and advanced patella femoral changes. Dr. Clifford performed an injection and still recommended total knee replacement once Plaintiff is able to proceed. Dr. Clifford testified that Plaintiff's left knee condition had worsened significantly, and that Plaintiff's only option is total knee replacement. Dr. Clifford testified that the work restrictions would be in place until Plaintiff had the surgery, and that they might need to be even more stringent.
31. The parties have stipulated that Dr. Clifford is an expert in orthopaedic surgery. The Full Commission finds that Plaintiff maintains good doctor-patient relationships with Dr. Clifford and Dr. Alexander.
32. Dr. Clifford unequivocally testified, based on his observations of Plaintiff and his review of Plaintiff's prior medical records, that the December 2, 2003, accident more likely than not aggravated Plaintiff's pre-existing left knee problems. He stated that he was aware that Plaintiff could only say that he had been jostled around in the collision, and stated that the fact that Plaintiff could not say definitively that he struck the dashboard with his left knee did not alter his opinion. As Dr. Clifford explained,
 There's no question [Plaintiff] had a direct injury that was acute, because the MRI shows that. I mean, the type of signal change that was present in his MRI is indicative of an acute injury. It's not indicative of chronic problems. . . .
 So this is one of those few times where it isn't really conjecture. I mean, I don't have to sit here and say yeah, this guy had arthritis before and his knee got worse to verify that's actually what happened because of his on-the-job injury. We have got an obvious test that shows this injury, which then leads to his worsening arthritis. *Page 15 
33. The Full Commission expressly finds Dr. Clifford's testimony credible and finds that, if there was any hostility toward Defendants evident in Dr. Clifford's testimony, it does not rise to the level of suggesting undue bias on the part of Plaintiff.
 * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On December 2, 2003, Plaintiff sustained an injury by accident to his neck, low back and left knee. N.C. Gen. Stat. § 97-2(6).
2. As a direct and proximate result of Plaintiff's injury by accident on December 2, 2003, and his resulting medical conditions to his neck, low back and left knee, Plaintiff was disabled from June 4, 2004, to the present and continuing. Plaintiff has met his burden of proving disability under Russell v. Lowes Product Distribution,108 N.C. App. 762, 425 S.E.2d 454 (1993):
 The burden is on the employee to show that he is unable to earn the same wages he had earned before the injury, either in the same employment or in other employment. The employee may meet this burden in one of four ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury.
Russell at 765, 425 S.E.2d at 457 (citations omitted). Plaintiff has demonstrated his disability during the period following June 4, 2004, under prongs (2) and (4) of Russell by producing *Page 16 
evidence of brief periods of employment at wages significantly less than that earned prior to his injury and evidence of a reasonable but unsuccessful subsequent effort to obtain employment. Id.
3. To the extent that Plaintiff's work for St. Andrew's and the industrial maintenance work in December 2005 demonstrate Plaintiff's partial, instead of total, disability during those periods pursuant to N.C. Gen. Stat. § 97-32.1, Plaintiff's disability compensation during those periods is properly reduced to 66 2/3% of the difference between Plaintiff's pre-injury weekly wage and the weekly wage earned following his injury pursuant to N.C. Gen. Stat. § 97-30. Accordingly, for the nine weeks of labor for which Plaintiff earned wages following his termination by Defendant-employer, plaintiff is entitled to compensation of $616.67 per week instead of the $674.00 per week Plaintiff would be entitled to receive for total disability.
4. To the extent that Plaintiff's disability due to his work-related knee injury was compounded by disability due to non-work-related cancer therapy and a resultant heart attack after February 2005, Defendants have failed to present evidence "attributing a percentage of the claimant's total incapacity to [his] compensable injury, and a percentage to the non-compensable condition," Counts v. Black DeckerCorp., 121 N.C.App. 387, 390-91, 465 S.E.2d 343, 346, disc. reviewdenied, 343 N.C. 305, 471 S.E.2d 68 (1996), such that the Commission might apportion Plaintiff's disability between work-related and non-work-related causes during that period of time. To the contrary, the evidence of record indicates that plaintiff's work-related knee condition deteriorated between February 2005 and October 2005. Because the Full Commission has concluded that Plaintiff was totally disabled due to his work-related knee injury as of February 2005, the Full Commission further concludes that Plaintiff was totally disabled *Page 17 
due to his work-related injury following February 2005, regardless of any additional disability due to his non-work-related cancer therapy.
5. As a direct and proximate consequence of Plaintiff's compensable injury by accident, Plaintiff is entitled to temporary total disability compensation at a rate of $674.00 from June 4, 2004, to the present and continuing, with the exception of nine weeks for which Plaintiff is entitled to temporary partial disability at a rate of $616.67 per week. N.C. Gen. Stat. §§ 97-29, 97-30.
6. Defendants are entitled to a credit against the disability compensation owed to Plaintiff for unemployment benefits received by Plaintiff following his June 4, 2004, termination, in the amount of $9,620.00. N.C. Gen. Stat. § 97-42.1.
7. Plaintiff is entitled to have Defendants provide all medical treatment reasonably necessary to effect a cure, give relief, or lessen the period of disability resulting from his December 2, 2003, compensable injury by accident. Plaintiff's authorized treating physicians shall be Dr. Clifford and Dr. Alexander. N.C. Gen. Stat. § 97-25.
 * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 A W A R D
1. Subject to the attorney's fees hereinafter approved, Defendant shall pay temporary total disability compensation to Plaintiff at a rate of $674.00 per week from June 4, 2004, to the present and continuing until further order of the Commission, with the exception of nine weeks for which Plaintiff is entitled to temporary partial disability at a rate of $616.67 per *Page 18 
week. Such amount that has already accrued shall be paid in a lump sum. Defendants shall be entitled to a credit and offset in the amount of $9,620.
2. Plaintiff's counsel is entitled to a twenty-five percent attorney's fee. From the lump sum payment owed to Plaintiff, Defendants shall deduct one-fourth of the total amount and forward this directly to Plaintiff's counsel. Thereafter, Defendants shall forward every fourth compensation check directly to Plaintiff's counsel.
3. Defendants shall pay all of Plaintiff's medical expenses both incurred and continuing. This would also include paying for his continued treatment under the care of Dr. Alexander and Dr. Clifford to the extent that the same are reasonably necessary to effect a cure, give relief, or lessen the period of Plaintiff's disability, when bills for the same have been approved in accordance with the provisions of the Act.
4. Defendants shall pay the costs.
This the __ day of May, 2007.
 S/_______________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/_______________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ BUCK LATTIMORE CHAIRMAN